Okay. My name is Marcy Jacobs. I'm an assistant state's attorney representing the people of the state of Illinois. Okay. Fifteen minutes per side. If we, you know, berate you unnecessarily with questions, we might give you some more time. Save some time for rebuttal. And please remember that these microphones are for recording, not amplification. So keep your voice up. Okay. Thank you. May it please the court. I represent the defendant, Appellant June Johnson, and of course, as you suggested, I'd like to reserve a few minutes for rebuttal. My intent today was to focus primarily on issue number one, related to the aggravated kidnapping conviction. Although, of course, I'll entertain any questions on any of the issues. I think your instincts are quite good. Okay. So Mr. Johnson was convicted of aggravated kidnapping under a theory of aspartation with intent to secretly confine while committing the offense of criminal sexual assault. It's worth noting that Mr. Johnson, as a result of this case, was deemed an habitual criminal and is now serving a mandatory natural life sentence. So the question of whether what occurred here was just criminal sexual assault, or whether it really was a sexual assault plus a separate kidnapping in its own right, is a question that has tremendous consequences for him. Well, didn't he receive two consecutive sentences of natural life? Yes. So to be taken out of eligibility for being a habitual criminal, this court would have to grant us relief on issues one and two, the aggravated kidnapping and then both the aggravated criminal sexual assaults. So this court has observed the inequity that occurs in convicting someone of kidnapping when the aspartation or detention of the victim was really just an incidental part of a different offense. And one thing that this court has repeatedly stated in the past about the offense of kidnapping is that the gist of this offense or the heart of this offense is secret confinement. And I would argue that's the case even under an aspartation theory of kidnapping, because the aspartation still has to occur with the objective of secret confinement. So I think when we look at these four factors, we have to look at it through that lens. For example, so when we look at the first factor here, the duration or distance of the aspartation, you know, whether the aspartation was just one or two feet, as J.B. testified, or whether it was actually, as she indicated on the photographs, across the length of a small yard and by the opening of the alley at the rear by these garages, you know, the distance isn't the real issue, I think. And the cases say this, you know, there's no magic  there. And the real issue, I think, is was there movement from a more public to a more secret location. And isn't that supported by her testimony when she said initially they were in the vacant lot, and when someone walked close by, the defendant moved her to the rear of the lot and in between two garages? He did move her towards the rear of the lot between these garages. But, you know, if you look at the photos, they show that the opening between these two detached garages where the assault was completed, you know, he didn't push her all the way down into this alley. They were really just one or two feet inside. Did they go from the sidewalk to the alley and then in between the garages? So they went from the sidewalk across this lot, across, I guess there was a small footpath or alley, and then between these two garages. But, you know, I would submit that the important point here is that passerbys, they were still visible to passerbys, I think, on the sidewalk. Because there's two points I want to make about this. So, you know, I don't know if there's a lot of evidence to support this, but I think it's important. Well, you know, they were in front, these garages were in front of an empty lot. So if there had been a structure or something in the lot, the view would have been obstructed. But that wasn't the case. You could see straight through all the way to this opening by the garages. And we know that the area by the garages was well lit, too, because I think J.B. testified, he had her up against the garage. How would somebody walking on the sidewalk see that? And I, you know, and I apologize because I don't know the, I can't think of the exact exhibit numbers. It's the one that shows the alley and... Right. I think in that one there's a fence, like a gate that's closed that was open at the time. She said the gate was open at the time of the offense. And in one of those photos, you can see, one of them is kind of zoomed back, and I think it's taken from the lot. And you can see, you still see her blue panties on the ground. He didn't pick that spot because it's easier to be seen, did he? He certainly, he didn't pick it because it's easier to be seen. But I would submit that he picked it because it was... This is not exhibitionism. This is rape. I understand. I understand. I would submit that, and the point I'm about to make may be a bit crude, so I apologize and I don't want to make anyone uncomfortable. But I think there was testimony, J.B. testified that he had her, like, up against the garage. And I don't know the exact spot. He was leaning on the garage as he was penetrating her. So to the extent that there was this brief aspiration, I would submit it was so... He had something to lean on in terms of carrying out the physical mechanics of the assault to facilitate that. He may just have been looking for a nearby surface to lean on. I sympathize with your role right now. I really do. Thank you. I appreciate that. So, you know, I think if the intention was to secretly confine her, he could have taken five seconds to push her deep down into this gangway or alley, but they were right near the opening. And I would submit he was just trying to find a way to better physically carry out the mechanics of the assault. So the aspiration in this case, you know, I would argue that it occurred... Can't we infer from the fact that the assault began in the vacant lot and someone walked by, a car drove by, and then Johnson moved her back to the alley, that the jury was justified in finding that the aspiration he intended to secretly confine her? I would suggest that... In terms of the mechanics, it would have been easier to complete it in the vacant lot. I mean, I would suggest if this really was about secret confinement, they wouldn't have stayed in the vacant lot. They would have stayed right near the opening, right in front of this big light that she said was shining on them. He could have taken just an extra couple seconds to push her deep down into the gangway. You know, and that's something I think that people via LAMP key looked at. The court there noted that... So in that case, I think the defendant had pulled the complainant off the sidewalk into the building. And they remained in the front hallway right by the door where he attempted to sexually assault her. And they noted, you know, he could have pulled her up into his apartment. He could have pulled her up the stairs, but he stayed right there where they were still visible to passersby. And I think the same reasoning can apply here. So... So I would argue that this aspiratation occurred during and in between an ongoing episode of sexual assault. And to the extent that there was a brief aspiratation, it was likely to simply get in a better position to physically facilitate the assault. So in that sense, it was inherent in the assault. With respect to whether the aspiratation created an independent danger, that fourth factor, I think most cases looking at that factor again focus on whether the secrecy or privacy of the place of confinement creates potential for further danger or criminal activity. And to the extent that the state argues that there was an independent danger in the aspiratation because she was being choked as she was being moved, this, of course, ties in with our second issue because there was really no evidence aside from her testimony that the choking took place. And if it did, there was certainly no evidence that it was of such a type that would cause injury or danger to her. If anything, it seemed like it was just more in the manner of restraining her. Well, the doctor found some bruising on her arm. That's correct. The doctor found what he called were finger marks on her arms. But he didn't find... This was a few hours after the incident. That's correct. But there was no evidence of any trauma or choking or any injury about the neck. So there was no evidence that this... But she said he held her tight. And when she was asked about breathing, she said she had some problem. Well, so how this occurred was the prosecutor asked, you know, how did it feel when he had his arm around your neck? And she said it was tight. You know, that's sort of vague. We don't really know how tight it was. Was it really tight enough to cause her discomfort or was it just restraining her? And clearly the answer to that question didn't satisfy the prosecutor because then the prosecutor kind of nudged her further. Well, didn't it cause you some trouble breathing at this point? She was like, okay, well, yeah, a little. But a balanced consideration, I think, of these factors, these Levy-Lombardi factors, I think, tend to weigh in favor of finding that to the extent that there was a brief aspartation in this case, it was wholly incidental to the criminal sexual assault. With respect to the finger marks, you know, we don't know. There was evidence here of an equally plausible and likely alternative explanation for those finger marks on her arms. She had testified that when she was initially grabbed, she thought it was her boyfriend because her boyfriend has this practice of coming up behind her and grabbing her to warn her or scare her about walking alone at night. That's not what the testimony was. The testimony was that the boyfriend would sometimes, and not a regular practice, I didn't see her use those words, but would hold her waist. There's a big difference in one's waist and one's neck. I mean, at the very instant that she was held, maybe that crossed her mind, but there's no similarity between what the boyfriend did and what Mr. Johnson did. Well, I believe what her exact testimony was, and you can, of course, look at the record and see, but I believe what her exact testimony was is, yeah, my boyfriend grabs me like that all the time. I'm sure she used the phrase all the time. But, again, you can go back and look at the record and see what her exact words were. Her words were, well, the question was, your boyfriend doesn't talk to you in that manner, but your boyfriend wraps his arms around your neck and chokes you? That was the question. No, he doesn't, was the answer. He usually tells me to never walk anywhere without looking behind you. That's what my baby father does. And when I turned around, before he grabbed me, yeah, he does that all the time, but he doesn't wrap his arms around me and choke me. He'll come up to me and he'll put his hands around my waist. Sure. Okay. So I think she did testify that he does this quite often or all the time. Now, to the extent that she said what she testified about where his hands are, the fact remains that he does this, you know, really as developed as it could have been or should have been, and counsel wasn't prepared to develop it because he wasn't on notice of the State's theory about the injuring to her arms. I mean, ideally you'd want to engage in a whole line of questioning about this. You know, does he ever grab you anywhere else than your waist, like your arms? How often does he do that? When was the last time he did that? Based on the defendant's testimony, he didn't have a lot to work with. I mean, you're talking about developing, you know, arguments about where these marks came from. Sure. But, you know, the point is he was ambushed by this theory, and this ties into our variance argument that he was misled by the State's theory about the finger marks on the arms. Whatever the defendant's testimony was, this was an alternative explanation for the finger marks on her arms. I mean, I would submit the State still, they didn't prove the bodily harm. I would submit they had an obligation to link those bruises on her arms to this encounter with the defendant once there was testimony that her boyfriend sometimes came up and grabbed her. But there's a big difference between one's arms and one's waist. But she said that he had a regular practice of grabbing her. That was the testimony, yes. Yes. Were there any other questions? Thank you. Good morning. My name is Marcy Jacobs. I represent the people of the State of Illinois. The amount of Illinois case law supporting defendants' asportation of J.B. as not being incidental to his criminal sexual assault of her is simply voluminous. Especially now where all the evidence must be viewed in the light most favorable to the State and all reasonable inferences made in favor of the State. There is no question that even the first asportation of just a couple feet from the sidewalk to the lot and then the second longer asportation of across the entire lot over an alley and into the space between two garages certainly satisfies all four of the requirements of finding that this is not incidental. What about Ms. Bujabi's point that this was a well-lit area according to J.B. and that passersby could still see them? And if he really wanted to secretly confine the victim against her will, he would have taken her further into the space between the garages? Well, I think he took her pretty far into the space between the garages. At one point I think it was testified where the underwear was found it was seven or eight feet deep into the garages. And the case that defendant brought up, Lamke, my recollection of that case is that was during broad daylight and the defendant took that victim into a vestibule literally right off a very busy sidewalk. There's no comparison in this case. It's 2.30 in the morning. There's not a million people walking by. And it was behind the house. It was passed through an alley into the space between two garages. It was pitch black outside even if there was some lighting. Just because defendant may have not succeeded in finding the most private place in the world doesn't mean he didn't try and that the aspertation wasn't in fact far more private than where he originally attempted to commit his criminal sexual assault on her. Illinois courts have held in case after case after case that aspertation of less than one block in just a few minutes certainly satisfies that requirement. And certainly the aspertation itself. In addition, the factor that I think you're referring to, Justice Mason, about if it was in a secret place where there was a risk of more significant danger, that's the fourth factor, whether the asperation created a significant danger independent of the criminal sexual assault. And that's one aspect of it because it was in a more private place so more danger could have been done there. But there was another aspect of it that the actual aspertation itself, where she was grabbed and shoved and dragged and pushed as she was being choked and threatened across that lot into that space in between the two garages, is a danger in and of itself separate from the criminal sexual assault. And several cases are very at point saying that exact thing. There was a case people v. Lloyd were saying the danger from the movement itself where the victim was grabbed from behind, threatened and forced to walk in this manner satisfies that requirement. I do want to touch on several things that counsel touched on. As far as the finger marks, as far as whether the finger marks could have been caused by JB's boyfriend. First of all, this is a factual issue that the jury heard. And defense counsel certainly questioned JB on that matter. And it was a factual issue resolved by the jury that now must be viewed in the light most favorable to the state. But she was never asked whether she had bruise marks on her upper arm before this attack. That is true. She was never directly asked that. But certainly there's case after case that shows that can be inferred. It's certainly a reasonable inference that she has these bruise marks after she describes an attack where she's violently grabbed, choked, pushed, shoved, pinned, shoved a hand down her pants. When you look at that, it's viewed in the light of common experience and common knowledge. And certainly it's a factual issue that she got those finger marks from him when he did that. And there's several cases in my brief that highlight that that's absolutely true. But I do want to point one thing out where defendant talks about being ambushed by this information. It's completely misleading where, first of all, the evidence of the finger marks were duly noted in the medical records. And defense counsel himself cross-examined the doctor and the nurse stating to the doctor, isn't it true you wrote down that she had these finger marks on her arms? His point he was trying to make is that he didn't write down, did she have anything around her neck? He stated that. So there was no ambush here. He knew about those finger marks. The point was that the charging instrument, even though it didn't have to, mentioned choking. And it didn't say anything about the bruises to the arms. I mean, isn't there an element of surprise there? There's absolutely no element of surprise where that verbiage is, for sure, just mere surplisage and didn't need to be there. But this fatal variance argument is really just, again, a factual argument. The words that the defendant complains about that were in the indictment, used his arm to choke J.B. around the neck. That phrase, even if it wasn't mere surplisage, which it absolutely, absolutely is, based on all Illinois law, even if it wasn't, that phrase can be proved not just by physical injuries, but by pain. And the evidence on the record, and the defendant acknowledges it can be proved by pain, she just disagrees that in this case there was evidence of pain on the record, but that's a factual issue. And the evidence of pain on the record was replete in light of common experience, that this woman who was grabbed, choked, pushed down, shoved down, her book bag fell, she dragged across a lot, pinned up against a thing, violently raped, that she would have experienced pain. And there, in and of itself, and if we're sticking to just the pain had to be around her neck, she might not have been the most articulate victim in the world, but she certainly testified to enough that common experience and common knowledge would lead anybody to an inference that she experienced pain even just from that choking. The defendant even acknowledges that in her brief. And where she could have experienced that pain, that's a factual argument, and it does not at all go to a fatal variance. But again, even the finger marks, where a defendant makes this big separation that these finger marks do not go to the language, used his arm to choke her around the neck, this defendant was 6 feet tall, 219 pounds, bragged that he could bench 315 pounds, he grabs this little 5'6 girl, he grabs her from behind, he arranges himself to choke her around the neck, he's rolling on the ground with her, pinning her up, these finger marks didn't come from when he used his arm to choke her around the neck. Those finger marks could have happened during him arranging himself to do that. So there's absolutely no ambush here and no fatal variance here. These are factual matters that must be viewed in the light most favorable to the state. And again, counsel's comment about going back to the aspiratation argument about he was trying to get her in a better position up against the wall, again, these are just all factual arguments. She cannot say that it cannot be said at this point that no reasonable trier of fact could have found and made these inferences, especially viewed in the light most favorable to the state, that all four elements of the aspiratation show in support that it was not merely incidental to the criminal sexual assault in this case. Are there any other questions? Then I would ask that this court please affirm defendant's convictions for aggravated criminal sexual assault based on kidnapping and aggravated kidnapping. Thank you. Just a couple of brief points. You know, the state asks this court to infer based on common knowledge that the complainant experienced pain as a result of being choked. And there are cases that state that a court can make this kind of inference. But the difference between those cases in here is that the record, I would argue, affirmatively rebutts that she felt pain where she was asked point blank, how did it feel when he put his arm around you? And her response, I would say, fell short of something indicating pain. And you know, the case law is not clear. It doesn't specify exactly what defines pain. But I would argue here the response fell short of what counts as the physical suffering we commonly think of as pain. With respect to the finger marks, you know, yes, these are factual issues. And I acknowledge the standard of review here. The evidence is to be viewed in the light most favorable to the state. And the state is entitled to the reasonable inferences from the evidence. But they're not entitled to any and all inferences. Just the reasonable inferences here. I don't know that it's reasonable to infer that with respect to these finger marks, that they were not attributable to her boyfriend where she says that he grabs her all the time. Didn't the jury hear Johnson's testimony? And his version was he lifted her up by her arms, right? You know, I apologize. I don't recall if that in fact was his. I think that was his version of this consensual encounter. Sure, I mean, his version is completely different than hers, obviously. And I can't recall if that in fact was his testimony. The state asks this court, you know, well, it could have happened this way. The finger marks could have, they were rolling around. It could have happened this way or that way. But this is, they have a burden. They have to prove that in fact it did. And again, to the extent that they're entitled to inferences in their favor, they're not entitled to any and all inferences, just the reasonable inferences. What makes this one unreasonable? I guess I'm lost in that. Well, so we have testimony that her boyfriend has a regular practice of coming up behind her and grabbing her. We don't know. Maybe he grabs her and then puts his arm around her waist. In order, your argument includes a lot of speculation in order to make it unreasonable, which is nowhere in the record. And again, part of the problem is the evidence on this point wasn't well developed because it did take defense counsel by surprise. But I think there's enough there where she says that he comes up behind me all the time. He has this practice of grabbing me. I think that raises a question. I don't know if that's a reasonable inference to make. I mean, the jury rejected it. Well, but I think this court has to decide was that a reasonable inference to make based on the evidence. Now, with respect to the State's arguments about the secrecy of the place where this assault was  completed, ultimately this court will have to look at the photos, look at the record. And you can decide whether the place by these garages was more secret or not. I would submit where it was visible to passersby. It was not. In concluding, I would just ask that this court really think about why we adopted the Levy-Lombardi Doctrine and the concerns that the doctrine is meant to address. They're not served by a very technical analysis of what the statutory elements are. The four factors really are about trying to determine what was at the heart of this offense that took place. Was this really about trying to esport the complainant to a secret place or was it really just about trying to carry out a sexual assault? So that's what this court has to decide. We appreciate the briefs and argument by two very capable advocates. We'll take the matter under consideration and get back to you with a decision promptly.